IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MICHELLE VIRGINIA HOLLAND,       )
                                 )
              Plaintiff,         )
                                 )
     v.                          )    1:20CV850
                                 )
KILOLO KIJAKAZI,                 )
Acting Commissioner of Social Security,[1]  )
                                 )
              Defendant.         )

FILED
in the Middle District of
North Carolina
**February 28, 2022
8:05 pm**
Clerk, US District Court
By: _____kg_____

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Michelle Virginia Holland ("Plaintiff") brought this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits ("DIB") under Title II of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.   PROCEDURAL HISTORY

Plaintiff protectively filed her application for DIB on October 2, 2017, alleging a disability onset date of June 1, 2009. (Tr. at 12, 181-82.)[2] Her date last insured was March 31, 2015, so the time period at issue is June 1, 2009 to March 31, 2015. Her claim was denied

---

[1] Kilolo Kijakazi was appointed as the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Andrew M. Saul as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Administrative Record [Doc. #11].

initially (Tr. at 78-86, 105-13), and that determination was upheld on reconsideration (Tr. at 87-100, 117-24). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 125-26.) Plaintiff attended the subsequent hearing on August 7, 2019, along with her attorney and an impartial vocational expert. (Tr. at 12.) Following the hearing, ALJ concluded that Plaintiff was not disabled within the meaning of the Act for the period from June 1, 2009 to March 31, 2015. (Tr. at 26.) On August 5, 2020, the Appeals Council denied Plaintiff's request for review, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-6).

II.   LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is

evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

Case 1:20-cv-00850-NCT-JEP   Document 19   Filed 02/28/22   Page 3 of 18

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

4

that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" between her alleged onset date of June 1, 2009 and her date last insured of March 31, 2015. Plaintiff therefore met her burden at step one of the sequential evaluation process. (Tr. at 14.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments through her date last insured:

> Allergic rhinitis; reactive airway disease; dermatitis with intermittent eczema, hypothyroidism; obesity; possible borderline personality disorder; questionable major depressive disorder; [and] questionable posttraumatic stress disorder[.]

(Tr. at 14.) The ALJ next found at step three that none of Plaintiff's impairments, individually or in combination, met or equaled a disability listing. (Tr. at 15-18.) Therefore, the ALJ assessed Plaintiff's RFC and determined that, through her date last insured, Plaintiff had the RFC to perform light work with the following nonexertional limitations:

5

> [Plaintiff] can perform no more than occasional postural movements, but can never climb ladders, ropes or scaffolds; must avoid concentrated or frequent exposure to pulmonary irritants and all exposure to hazards in the work environment. Also, [Plaintiff] is limited to maintaining concentration, persistence and pace for performance of simple, routine and repetitive tasks characteristic of unskilled work at all reasoning levels of unskilled work.

(Tr. at 18.) At step four of the sequential analysis, the ALJ found that Plaintiff had no past relevant work. However, at step five, the ALJ found that, given Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, Plaintiff could perform other jobs available in the national economy. (Tr. at 24-26.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 26.)

Plaintiff now contends that substantial evidence fails to support the ALJ's RFC finding in two respects. First, she argues that the ALJ failed to properly consider the opinions of Dr. Natalie Sadler, a psychiatrist who treated Plaintiff between October 12, 2016 and May 29, 2019. Second, Plaintiff asserts that the ALJ failed to "sufficiently develop the record regarding the possibility that [Plaintiff's] allegations of physical pain and symptoms were the product of somatoform disorder." (Pl.'s Br. [Doc. #15] at 2.) After thorough consideration of the record, the Court finds that neither of these contentions merit remand.

    A.    Dr. Sadler's opinion evidence

Plaintiff first challenges the ALJ's treatment of a medical source statement completed by Plaintiff's treating psychiatrist, Dr. Sadler. As the ALJ correctly notes,

> Dr. Sadler provided opinions based on treatments that, specifically, were for the period from October 12, 2016 through May 29, 2019. Thus, the doctor did not begin treating [Plaintiff] until some 20 months after her date last insured for disability benefits. As such, the opinions are not based on professional interaction with or contact with [Plaintiff] during the relevant period under adjudication and have no significant relevance in determining [Plaintiff's] residual functional capacity for the relevant period.

6

(Tr. at 24.)

Plaintiff now claims that the timing of Dr. Sadler's opinions was not a sufficient reason to discount them. In considering Plaintiff's contention, the Court acknowledges that,

> in some instances, medical evidence that post-dates a claimant's DLI may be considered where it is relevant to prove disability prior to that date. Specifically, the Fourth Circuit held in Bird [v. Comm'r of Soc. Sec., 699 F.3d 337, 340-41 (4th Cir. 2012)] "that post-DLI medical evidence generally is admissible in an SSA[Social Security Administration] disability determination in such instances in which that evidence permits an inference of linkage with the claimant's pre-DLI condition." 699 F.3d at 341 (citing Moore v. Finch, 418 F.2d 1224, 1226 (4th Cir.1969)). In the case of medical opinions, the evidence in question "must relate back to the relevant period" and "offer a retrospective opinion on the past extent of an impairment."

Emrich v. Colvin, 90 F. Supp. 3d 480, 485 (M.D.N.C. 2015). Notably, the claimant in Bird did "not have any medical records dating before his DLI." Bird, 699 F.3d at 339. Therefore, the court found the ALJ's refusal to consider post-DLI evidence to be error because "the claimant's retrospective, post-DLI evidence could have been the 'most cogent proof' of the claimant's pre-DLI condition." Emrich, 90 F. Supp. 3d at 487 (citing Bird, 699 F.3d at 341) (citations omitted). Correspondingly, "Bird has . . . repeatedly been found 'inapplicable where there was meaningful evidence of the claimant's disability' or lack of disability during the DIB coverage period." Tolbert v. Colvin, No. 1:15CV437, 2016 WL 6956629, at *4 (M.D.N.C. Nov. 28, 2016) (citing Emrich, 90 F. Supp. 3d at 487 ("[A] linkage between Emrich's pre- and post-DLI depression conditions was unnecessary because Emrich was treated for depression throughout her disability insurance coverage period, and the ALJ considered whether that direct evidence supported a finding of disability.")).

In the present case, Dr. Sadler took over Plaintiff's mental health treatment in October 2016 after Dr. Peter Adland, Plaintiff's psychiatrist from May 2010 to April 2016, closed his

7

practice. (Tr. at 832.) Plaintiff contends that Dr. Sadler's treatment notes and opinions relate back to Plaintiff's treatment prior to her March 31, 2015 date last insured. However, the Court notes that, unlike in <u>Bird</u>, there was substantial record evidence in the present case regarding Plaintiff's impairment prior to the DLI. Specifically, the medical record in this case reflects that Dr. Adland treated Plaintiff for six years, with nearly five of those years falling prior to Plaintiff's DLI, and with the record including dozens of treatment notes for Plaintiff's regular visits during that time. (<u>See</u> Tr. at 22, 23, 284-87, 486-508.) The ALJ recounted these records at length, noting as follows:

> Doctor Adland indicated questionable diagnoses of PTSD and major depression after he first interviewed the claimant on May 4, 2010 and his intention was to delve further into the claimant's history to determine the areas in which she needed therapy (Exhibit 13F page 22). However, when he next saw her on May 10, his diagnostic assessment focused on complaints of chronic pain and fatigue and a notation of feelings of inadequacy. However, the assessment also noted that the claimant was more focused and organized "to find other employment." The doctor also documented the claimant's lack of typical posttraumatic stress disorder symptoms and could only note the claimant's subjective history of panic attack symptoms. Based on the subjective history of "keeping things" the doctor commented that there was minimal evidence of obsessive compulsive disorder (OCD) symptoms (page 20). It is significant that the claimant never mentioned symptoms of panic attacks except at the initial intake visit on May 10, 2010 when she told the doctor that she had a remote history of panic attacks but had not had an attack in three years. She also noted that she had learned how to deal with these attacks (Exhibit 3F page 20). The statement contradicts the claimant's testimony. As of March 9, 2015, just prior to the claimant's date last insured the claimant really was not talking about depression but, as noted above, focused on fatigue, joint pains, poor sleep (page 7). It was only in 2016, well after the claimant's date last insured that she again reported panic attacks (pages 1-5). Significantly, there are four comments in the notes for October 2015, February 2016 and April 2016 showing that the claimant was pursuing a class to become a yoga instructor. The claimant had begun the class in the summer of 2015 and indicated that it was having a good effect on her life. In fact, at that point, she was not scheduled to return for counseling for six months. She, herself, asked for an earlier appointment for February 2016, at which time she was still engaged in yoga training. She described in detail her yoga class with no indication of any decreased speech

> output despite complaining of this at the session. She was advised to take her Adderall prescription regularly and to increase her dose of Fluvox which, the claimant indicated, helps her condition. When seen in April 2016 the claimant was still engaged in her yoga training, but was not using Adderall. She was, however, using her other medications as prescribed and adhering to her Adderall prescription (pages 3, 5, 6).
>
> . . .
>
> Dr. Adland gave tentative diagnoses of depression and PTSD, but later noted that the PTSD symptoms were atypical. He further noted in several of the initial records that it was hard to assess the claimant's case as a personality disorder or a mixed mood disorder. He noted some inconsistencies of presentation with the claimant joking and smiling despite her reports of severe depression. These inconsistencies are seen at the evaluations for June 27, 2011 at Exhibit 13F page 16. While the claimant said that she was not doing well, he noted that she was joking and laughing and that her affect brightened as the session progressed. Assessing her progress, the doctor noted that her issues were partly "personality-part mood, but she is not as depressed as she would be." Also inconsistent with the claimant's overall presentation, the note for May 8, 2012 (Exhibit 13 F page 15) indicated that the claimant was reporting severe symptoms of sleeping all day, but the doctor noted her to have no observed evidence of decreased mood and observed that she was "joking as ever" when describing her problems. Dr. Adland also noted, as mentioned above, that the claimant appears to have been pursuing a photography business with the pursuit causing some drama in her life involving some unspecified association with Facebook and a nonprofit (Exhibit 13F page 14). The undersigned notes that Dr. Adland frequently asked the claimant to return for follow-up's [sic] in . . . three to four months or six months, which is consistent with managed and stable status, not exacerbation of symptoms (Exhibits 2F and 13F).

(Tr. at 22-23.) The ALJ further noted that both of the State agency psychological consultants who reviewed Plaintiff's claims found insufficient evidence of any severe, medically-determinable mental impairments prior to Plaintiff's date last insured. (Tr. at 23, 83-84, 97.)

Because the ALJ based the mental RFC determination in this case on contemporaneous treatment notes and other medical evidence, no further consideration of Dr. Sadler's opinions was required under <u>Bird</u>. Nevertheless, the ALJ did not discount Dr. Sadler's opinions solely

9

Case 1:20-cv-00850-NCT-JEP   Document 19   Filed 02/28/22   Page 9 of 18

on the basis of timing. She also cited significant issues regarding the consistency and supportability of Dr. Sadler's statements:[5]

> The doctor's comment in Exhibits 11F and 22F that she did not feel that the claimant could "function in a regular job" is a statement regarding the ultimate issue of disability, a matter reserved to the Commissioner the Social Security Administration. As for the checkmark style assessment in Exhibit 23F, the doctor indicated "extreme loss" in the claimant's ability to sustain performance during an eight hour workday. She indicated extreme limitation in the claimant's ability to understand, remember, and execute detailed instructions, maintain regular attendance, or maintain attention and concentration for two hour segments. She also indicated extreme limitation in the claimant's capacity for working in coordination with or proximity to others, dealing with the stress of semiskilled work or performing at a consistent pace without an unreasonable number and length of rest periods. She also noted extreme loss even in the claimant's ability to respond appropriately to changes in routine work settings or use public transportation. Marked loss was indicated even when simple work-related decisions were involved. **Those limitations are inconsistent with the longitudinal medical record, which depicts better functioning than Dr. Sadler indicates. Specifically, the undersigned notes the observations from Dr. Adland, who did observe the claimant during the relevant period under adjudication, and which the undersigned has discussed above when summarizing exhibits 2F and 13F.**

(Tr. at 24 (emphasis added).) In short, the ALJ expressly relied on Dr. Adland's six years of treatment records, which recounted treatment at three- to six-month intervals, adequate response to medications, limited problems with ongoing anxiety, a "joking" demeanor despite allegations of depression, and the ability to pursue training as a yoga instructor and work as a freelance photographer, to discount Dr. Sadler's later findings of "extreme" limitations. To the extent Plaintiff raises objections to the weighing of the evidence by the ALJ, Plaintiff essentially asks the Court to re-weigh the evidence and come to a different conclusion than

---

[5] For claims filed on or after March 27, 2017, the Social Security regulations specifically provide that the most important factors when evaluating the persuasiveness of an opinion are supportability and consistency. 20 C.F.R. § 404.1520c(a), 404.1520c(c)(1)-(c)(2).

Case 1:20-cv-00850-NCT-JEP   Document 19   Filed 02/28/22   Page 10 of 18

the ALJ. However, it is not the function of this Court to re-weigh the evidence or reconsider the ALJ's determinations if they are supported by substantial evidence. As noted above, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472 (quotation omitted). Thus, the issue before the Court is not whether a different fact-finder could have drawn a different conclusion, or even "whether [Plaintiff] is disabled," but rather, "whether the ALJ's finding that [Plaintiff) is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig, 76 F.3d at 589. Here, the ALJ reviewed the evidence, explained her decision, explained the reasons for her determinations, and supported that explanation with substantial evidence.[6]

The Court also notes that as part of the challenge regarding Dr. Sadler's opinion, Plaintiff also contends that the ALJ failed to properly consider the effects of Plaintiff's limitations in maintaining concentration, persistence, and pace in the RFC assessment in accordance with Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015). In this regard, the ALJ determined at step three of the sequential analysis that Plaintiff has moderate limitations in her concentration, persistence, and pace. In Mascio v. Colvin, the Fourth Circuit explained that, where moderate limitations in concentration, persistence, and pace are reflected at step three, the ALJ should address those limitations in assessing the RFC or should explain why the limitations do not affect the claimant's ability to work. The Fourth Circuit specifically held

---

[6] To the extent Plaintiff contends that the ALJ used "conclusory reasoning" to reject Dr. Sadler's opinion, it is clear from the above discussion that the ALJ set out detailed reasoning supporting by substantial evidence. The ALJ specifically relied on the longitudinal record reflected in Dr. Adland's treatment notes set out at length in the ALJ's decision. Plaintiff also criticizes Dr. Adland's notes as "illegible," but both Dr. Adland's and Dr. Sadler's notes are handwritten, and the ALJ did not find either illegible and instead set out information from the records at length.

11

that "an ALJ does not account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work." Mascio, 780 F.3d at 638 (quotation omitted). This is because "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." Id. The Fourth Circuit further noted that

> [p]erhaps the ALJ can explain why Mascio's moderate limitation in concentration, persistence, or pace at step three does not translate into a limitation in Mascio's residual functional capacity. For example, the ALJ may find that the concentration, persistence, or pace limitation does not affect Mascio's ability to work, in which case it would have been appropriate to exclude it from the hypothetical tendered to the vocational expert. But because the ALJ here gave no explanation, a remand is in order.

Id. (internal citation omitted). However, as previously noted in other cases in this District, the Fourth Circuit's decision in Mascio

> does not broadly dictate that a claimant's moderate impairment in concentration, persistence, or pace always translates into a limitation in the RFC. Rather, Mascio underscores the ALJ's duty to adequately review the evidence and explain the decision . . . .
>
> An ALJ may account for a claimant's limitation with concentration, persistence, or pace by restricting the claimant to simple, routine, unskilled work where the record supports this conclusion, either through physician testimony, medical source statements, consultative examinations, or other evidence that is sufficiently evident to the reviewing court.

Tolbert v. Colvin, 1:15CV437, 2016 WL 6956629, at *8 (M.D.N.C. Nov. 28, 2016) (finding that RFC limitations to "simple, routine, repetitive tasks with simple, short instructions, in a job that required making only simple, work-related decisions, involved few workplace changes, and required only frequent contact with supervisors, co-workers, or the public" sufficiently accounted for a Plaintiff's moderate limitations in concentration, persistence, or pace in light

12

of the ALJ's explanation throughout the administrative decision) (quoting Jones v. Colvin, No. 7:14CV273, 2015 WL 5056784, at *10-12 (W.D. Va. Aug. 20, 2015)); see also Sizemore v. Berryhill, 878 F.3d 72, 80–81 (4th Cir. 2017) (rejecting the plaintiff's argument under Mascio where the ALJ relied on the opinion of the state agency psychologist that, notwithstanding moderate limitations in concentration, persistence, and pace, the plaintiff could sustain attention sufficiently to perform simple, routine, repetitive tasks with additional limitations); Shinaberry v. Saul, 952 F.3d 113, 121-22 (4th Cir. 2020) (same, and noting that Mascio "did not impose a categorical rule that requires an ALJ to always include moderate limitations in concentration, persistence, or pace as a specific limitation in the RFC").

In the present case, as in Mascio, the ALJ found moderate limitations in concentration, persistence, or pace at step three of the sequential analysis. (Tr. at 17.) Later in the sequential analysis, the ALJ formulated a mental RFC indicating that Plaintiff "is limited to maintaining concentration, persistence and pace for performance of simple, routine and repetitive tasks characteristic of unskilled work at all reasoning levels of unskilled work." (Tr. at 18.) Plaintiff now argues that, in making this RFC finding, the ALJ did not fully account for Plaintiff's ability to stay on task in light of her moderate difficulties with concentration, persistence, or pace. However, the language of the RFC itself reflects that the ALJ specifically accommodated Plaintiff's moderate difficulties with concentration, persistence and pace by limiting her to simple, routine, and repetitive tasks. Moreover, the ALJ discussed the evidence regarding Plaintiff's mental health limitations at length, specifically with regard to the records from Dr. Adland as set out above. In addition, in undertaking the analysis at step two, the ALJ included detailed analysis of Plaintiff's limitations and abilities as follows:

13

In understanding, remembering, or applying information, the claimant has a moderate limitation. She is able to drive and adhere to traffic laws and the procedures for operating a motor vehicle. She is able to learn and technical job tasks, such as those involved in photography. The claimant has pursued photography throughout her alleged period of disability. She follows her medication regimen and actively participate in decisions about her medical care. She appeared fully capable of understanding and responding during the hearing and throughout the disability application process. The claimant has demonstrated the ability to adequately ask and answer questions throughout her disability application process, at the hearing, at medical encounters and in the course of working as a home health aide. She has pursued her disability application, which clearly demonstrates that she understands instructions and requirements for various processes, and successfully responds to them. There is no indication of any limitation in the claimant's ability to learn, remember and apply new information, at least as required for tasks involving no more than simple instructions based on the consistently normal mental status examinations as to attention, concentration and memory. She has consistently been observed to have logical thinking, intact memory and an absence of abnormal content.

In interacting with others, the claimant has mild limitation. The claimant presented herself in an appropriate and cooperative manner at all times during medical encounters and before the undersigned. She has shown herself capable of conforming to acceptable public social behavior as demonstrated by her comportment at medical examinations, before the undersigned, in her ability to perform normal daily activities requiring social contact. The claimant does engage in public contact. She noted doing some photography work and, during the alleged period of disability has gone on vacation with her husband three times. Such activity conflicts with the claimant's testimony of being homebound.

With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate to limitation. The claimant maintains her medication regimen, actively participates in her health care choices and treatment, obtains medical care and the necessities of daily life as needed and has persisted in her disability application process. She is able to sustain concentration, persistence and pace to do photography and pursue classes in yoga instruction. Mental status examinations have indicated that the claimant's attention and concentration, memory and thought processes are not significantly limited. She displayed adequate attention and concentration during the numerous medical encounters and before the undersigned.

As for adapting or managing oneself, the claimant has experienced mild limitation. The record indicates an independent lifestyle and good quality of life with the claimant demonstrating the capacity to adapt to life changes in the

> environment or to demands that are not already part of her individual life. The claimant has taken on the challenge of trying to do photography and of taking classes to become a yoga instructor. The undersigned sees no evidence of lack of independence in self-care. The claimant takes interest in her physical and mental health, and appears aware of common daily hazards (for example, those encountered while driving, engaging in routine public contacts, taking yoga instruction, doing photography and taking vacations. There is no indication that the claimant has had trouble in maintaining her active daily routines and succeeding at endeavors.

(Tr. at 17-18.) As set out above, remand is not required under Mascio where the ALJ's discussion of, and reliance on, substantial record evidence adequately explains why the plaintiff's moderate limitation at step three did not translate into any additional RFC restrictions. In this case, the ALJ discussed Plaintiff's mental impairments at length and included sufficient explanation to allow the Court to follow her reasoning, which is supported by substantial evidence. As such, the Court finds no basis for remand.

B. Somatoform disorder

Plaintiff next argues that "[t]he ALJ failed to develop the record regarding the question [of] whether [Plaintiff's] subjective experience of pain was due, in part, to somatoform disorder." (Pl.'s Br. at 17.) As acknowledged by Plaintiff, the ALJ found that the record in this case "show[s] a litany of subjective complaints for nearly every body system," but that Plaintiff's treatment notes and other medical findings provide little, if any, objective evidence to support these complaints. (Pl.'s Br. at 17-18 (citing Tr. at 22, 23).) "The unavoidable inference," Plaintiff asserts, "is that [she] is either a malinger . . . or someone whose pain experience is attributable to mental impairment," and "[i]t is extremely unlikely, given [Plaintiff's] long medical history, that her allegations of pain were simply the product of malingering." (Pl.'s Br. at 18.) Extrapolating from this line of reasoning, Plaintiff contends

15

that the ALJ "commit[ed] legal error by failing to consider an impairment that [was] reasonably suggested by the evidence." (Pl.'s Br. at 19.)

Plaintiff further argues that "the ALJ's duty to develop the record is not negated simply because [Plaintiff] did not allege somatoform disorder when she filed her claim," because "claimants who suffer from somatoform disorder are almost always unaware of having that impairment." (Pl.'s Br. at 22.) However, in the present case, no medical professional diagnosed, let alone treated, Plaintiff for a somatoform disorder or any other psychological disorder relating to her physical complaints. Plaintiff cannot fault the ALJ for failing to specifically address a diagnosis that was never made and that Plaintiff never proffered for consideration. Essentially, Plaintiff now suggests that the ALJ, an individual with no medical training, should have recognized the possibility that Plaintiff's alleged physical impairments indicated the presence of an undiagnosed and potentially disabling mental condition, a condition that all of the providers and medical reviewers in this case somehow missed. She further suggests that, although Plaintiff was represented by counsel who never suggested this possibility or requested further development of the record, the ALJ should have developed the record in support of this possibility *sua sponte*. This suggestion is simply not reasonable and goes well beyond the ALJ's responsibility for development of the record. Indeed, as noted by Defendant, this suggestion is contrary to the regulations, which provide that SSA will "consider only impairment(s) you say you have or about which we receive evidence." 29 C.F.R. § 404.1512(a).

Moreover, Plaintiff points to no evidence of how her alleged somatoform disorder would affect her RFC, other than her general contention that such a finding would support

16

her subjective complaints, and therefore a finding of disability. Plaintiff also contends that the ALJ should have considered whether Plaintiff's mental impairments met Listing 12.07 for somatoform disorder, but in doing so, she fails to allege, let alone show evidence to support, that her alleged impairment met all of the requirements of that listing. (See Pl.'s Br. at 21-22.) As noted above, none of the State agency physicians or psychologists in this case found sufficient evidence to support a finding of any severe medically determinable mental impairments, let alone an impairment that was *per se* disabling under the listings. (Tr. at 23.) Nevertheless, the ALJ gave Plaintiff the benefit of the doubt, finding at step two of the sequential analysis that Plaintiff suffered from respiratory conditions, dermatitis, hypothyroidism, obesity, and multiple mental impairments, including borderline personality disorder, depression, and posttraumatic stress disorder. (Tr. at 14.) The ALJ then took all of Plaintiff's impairments into account in setting the RFC. For example, in light of Plaintiff's obesity and pain complaints, the ALJ limited Plaintiff to light work with additional postural restrictions. (Tr. at 18.) She also limited Plaintiff to simple, routine, repetitive tasks to account for her mental impairments. (Tr. at 18.) Notably, the ALJ specifically stated that she included the findings of moderate limitations in understanding, remembering, and applying information and in concentrating, persisting, and maintaining pace included at step three of the sequential analysis out of an abundance of caution, as they were not reflected at the hearing or to a substantial degree, if any, in the treatment notes. (Tr. at 17.) Overall, it appears that the ALJ largely gave Plaintiff the benefit of any doubt when it came to her mental impairments during the relevant time period. The record in this case simply fails to suggest, let alone mandate, a determination that Plaintiff suffered from a somatoform disorder.

Case 1:20-cv-00850-NCT-JEP   Document 19   Filed 02/28/22   Page 17 of 18

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be AFFIRMED, that Plaintiff's Motion for Judgment on the Pleadings [Doc. #14] be DENIED, that Defendant's Motion for Judgment on the Pleadings [Doc. #16] be GRANTED, and that this action be DISMISSED with prejudice.

This, the 28th day of February, 2022.

/s/ Joi Elizabeth Peake
United States Magistrate Judge